673 So.2d 461 (1994)
Christopher D. BARBOUR
v.
STATE.
CR-93-931.
Court of Criminal Appeals of Alabama.
December 29, 1994.
As Corrected on Denial of Rehearing March 3, 1995.
*462 J. Cliff Heard, Frank W. Riggs, Montgomery, for appellant.
James H. Evans, Atty. Gen., and Gilda Williams, Asst. Atty. Gen., for appellee.
TAYLOR, Judge.
The appellant, Christopher Barbour, was convicted of murder made capital because the murder was committed during the commission of a rape, a burglary, and arson. *463 See  13A-5-40(a)(3), 13A-5-40(a)(4), and 13A-5-40(a)(9), Code of Alabama 1975. The jury, by a vote of 10 to 2, recommended that the appellant be sentenced to death. The court accepted the jury's recommendation and sentenced the appellant to death by electrocution.
The state's evidence tended to show that on March 21, 1992, 16-year-old William Roberts found the naked and partially burned body of his mother, Thelma Bishop Roberts, lying on the floor of her bedroom. There was a white plastic trash bag over her head and a knife protruding from her chest. William Roberts testified that when he saw his mother's body he removed the knife out from her chest and threw it across the room. He also removed the trash bag from her head and called the emergency police telephone number. William Roberts also testified that the jewelry that his mother always wore was missing.
Dr. Alan Stilwell, medical examiner for the Alabama Department of Forensic Sciences, performed an autopsy on the victim. It was his opinion that Thelma Roberts died as a result of nine stab wounds to her chest, one of which penetrated her left lung and one of which penetrated her heart, causing extensive internal bleeding. Two of the wounds had been inflicted with such force that they pierced her back. Dr. Stilwell further testified that the victim's eyes were swollen from repeated blows to her head.
Barbour confessed and gave a detailed account of the facts surrounding Roberts's murder. Barbour told police that on March 20, 1992, he, Chris Hester, and Mike Mitchell went to see, "Koon," who was a friend of Hester's and who lived on Manley Drive in Montgomery. Hester talked with someone at the door and discovered that Koon was not home. The three then went across the street to the victim's house. Barbour stated that they entered the house, sat down in the living room, and started drinking beer. Hester and the victim started talking. Later, the victim left the living room and went to the back of the house. A few minutes later, Hester also went to the back of the house. Hester and the victim remained there for several minutes while Mitchell and Barbour stayed in the living room. A short while later, Barbour and Mitchell heard loud noises coming from the back and went to investigate. They entered the bedroom and saw that the victim was naked and that Hester was wearing only his pants. Hester then hit the victim, and Barbour and Mitchell started hitting her about the head. The victim fell to the floor. Barbour and Mitchell got on either side of her and held her down while Hester had sex with her. After Hester got up and pulled on his pants, Barbour told the others that they could not leave because she could identify them. Barbour confessed that he then went to the kitchen, grabbed a knife, and returned to the bedroom. He got on his knees and forcibly stabbed the victim several times. He left the knife in her body, stood up, walked to the closet, threw some things from the closet around her body, and set them on fire. As they fled from the house Barbour grabbed the smoke detector off the wall in the hallway and threw it in the living room.
Because this case involves the death penalty, this court is obliged under Rule 45A, Ala.R.App.P., to search the record for plain error. Rule 45A, Ala.R.App.P., states:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."

I
Barbour initially contends that Alabama's system for compensating attorneys appointed to represent indigent defendants, set out in  15-12-21, Code of Alabama 1975, is unconstitutional. Specifically, he contends that the $1,000 cap on the amount that those attorneys can receive results in a deprivation of property without just compensation and is therefore unconstitutional.
Section 15-12-21(d), states:

*464 "(d) Counsel appointed in [indigent] cases ... shall be entitled to receive for their services a fee to be approved by the trial court. The amount of such fee shall be based on the number of hours spent by the attorney in working on such case and shall be computed at the rate of $40.00 per hour for time expended in court and $20.00 per hour for time reasonably expended out of court in the preparation of such case. The total fees to any one attorney in any one case, from the time of appointment through the trial of the case, including motions for new trial, shall not, however, exceed $1,000.00, except as follows: In cases where the original case involves a capital offense or a charge which carries a possible sentence of life without parole, the limits shall be $1,000.00 for out-of-court work, plus payment for all in-court work, said work to be billed at the aforementioned rates. Counsel shall also be entitled to be reimbursed for any expenses reasonably incurred in such defense to be approved in advance by the trial court. Retrials of a case shall be considered a new case."
This court in May v. State, 672 So.2d 1307, 1308 (Ala.Cr.App.1993), addressed the constitutionality of this Code section.
"The Alabama Supreme Court in Ex parte Grayson, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985), specifically held that Alabama's system for compensating appointed attorneys does not violate principles of due process or equal protection. Moreover, the Alabama Supreme Court in Sparks v. Parker, 368 So.2d 528 (Ala.1979), appeal dismissed, 444 U.S. 803, 100 S.Ct. 22, 62 L.Ed.2d 16 (1979), held that  15-12-21 does not constitute an unlawful taking of property in violation of the Fifth Amendment. All of the constitutional issues raised by the appellant have been reviewed and decided by the Alabama Supreme Court. Our court is bound by these decisions.
"Section 12-3-16, Code of Alabama 1975, provides:
"`The decisions of the supreme court shall govern the holdings and decisions of the courts of appeals, and the decisions and proceedings of such courts of appeals shall be subject to the general superintendence and control of the supreme court as provided by constitutional amendment No. 328.'
"While setting a `cap' on the amount of money that appointed attorneys may receive for representing indigent defendants has been held to be constitutional, such a practice may become unconstitutional when the `cap' is set too low. A rule of law may be constitutional as written, but become unconstitutional in application. Sparks v. Parker and Ex parte Grayson were released in 1979 and 1985, respectively. In the meanwhile, inflation has diminished the purchasing power of the dollar and has therefore affected the fee amount set in  15-12-21. This $1,000 `cap' for trial work was established in 1981. The real value of $1,000 is considerably less today than was intended when the statute was enacted and is certainly unreasonable. We urge the Supreme Court to grant certiorari review in this case and reconsider the constitutionality of the `cap' as now set by law."
On September 1, 1994, the Alabama Supreme Court granted certiorari review in May. However, under current law, Alabama's system for compensating attorneys appointed to represent indigent defendants is not unconstitutional.

II
Barbour next contends that the trial court erred in denying two of his discovery motions and that the trial court's denial violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
Barbour filed a motion to require the state to produce a copy of any contract that existed between Dr. Karl Kirkland and the state. Dr. Kirkland, a licensed psychologist, was employed by Montgomery County to conduct mental status evaluations of prisoners in the Montgomery County jail. Dr. Kirkland evaluated Barbour but did not testify at trial. Barbour has not shown how this evidence was either exculpatory or material. *465 The trial court did not violate Brady by denying this motion.
Barbour next contends that the court erred in denying his motion to require the state to produce the names of other persons who had been interviewed by Detective Danny Carmichael in the past two years. Barbour contended that Carmichael used physical coercion during the interview in which he confessed to the killing and he hoped to prove that this had happened to other persons Carmichael interviewed. The motion was filed in order to find out if there had been previous incidents of physical assault by Carmichael. The trial court held a hearing on the issue and the denied the motion. The court's order denying the motion stated:
"Barbour has also filed a motion for the state to disclose the names, addresses, telephone numbers and places of employment of all persons who have been interrogated by Detective Danny H. Carmichael within the last two years who were subsequently charged with a felony. Barbour alleges that Carmichael engages in a `consistent course of committing physical assaults upon persons accused or suspected of crimes in order to induce said persons to involuntarily confess commission of such crimes.' In support of the motion for disclosure Barbour offered the testimony of his grandfather [Mr. Brown] and Barbour's attorney's representation concerning a client who claimed to have been assaulted by Detective Carmichael.
"Mr. Brown's testimony is vague and uncertain. The Court accepts counsel's representation as truth; however, the Court finds that reports of two incidents of abuse apparently separated by many months are insufficient to order the requested disclosure."
The trial court did not err in denying Barbour's motion. "Absent clear error, the trial court's credibility choices at [motion] hearings are binding on this court." Powell v. State, 624 So.2d 220, 228 (Ala.Cr.App. 1993). The standard of review is whether the trial court's finding was "manifestly contrary to the great weight of the evidence." Powell, 624 So.2d at 228. The trial court was in the best position to evaluate the evidence and to observe the witnesses at the hearing. The court's ruling is supported by the evidence, and we will not disturb its ruling on appeal.
"`A motion for discovery is not a mere "fishing expedition." ... The accused is simply not entitled to pursue a "scatter gun" approach in his motion to produce.' Perry v. State, 371 So.2d 969, 970 (Ala.Cr. App.), cert. denied, 371 So.2d 971 (Ala. 1979) (citations omitted). Brady `did not envision the type "fishing expedition" requested by appellant.' Giddens v. State, 333 So.2d 615, 618 (Ala.Cr.App.1976)."
Timmons v. State, 487 So.2d 975, 982 (Ala. Cr.App.1986). See also Killough v. State, 438 So.2d 311, 316 (Ala.Cr.App.1982), rev'd on other grounds, 438 So.2d 333 (Ala.1983); and Perry v. State, 371 So.2d 969 (Ala.Cr. App.), cert. denied, 371 So.2d 971 (Ala.1979).

III
Barbour further contends that the court erred in denying his motion to suppress his videotaped confession. Specifically, Barbour contends that he was manipulated and deceived into confessing to the killing of Thelma Roberts.
"The general rule is that `"extrajudicial confessions are prima facie involuntary and inadmissible, and the burden is on the State to prove that the confession was made voluntarily."' Ex parte Weeks, 531 So.2d 643, 644 (Ala.1988), quoting Ex parte Callahan, 471 So.2d 463, 464 (Ala.1985). `Before an accused's confession can be received into evidence, the state must show that the statement was voluntary, that the accused was read his Miranda rights, and that he waived them.' Franklin v. State, 621 So.2d 364 (Ala.Cr.App.1992). See also Whitlow v. State, 509 So.2d 252 (Ala.Cr. App.1987)."
A.M. v. State, 623 So.2d 421, 424 (Ala.Cr. App.1993).
Barbour contends that his confession was involuntary. "[T]he voluntariness of a confession need be established only by a preponderance of the evidence...." Colorado v. Connelly, 479 U.S. 157, 168, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986). See also Coral v. *466 State, 628 So.2d 954 (Ala.Cr.App.1992); A.M., supra; Jackson v. State, 562 So.2d 1373 (Ala.Cr.App.1990); Marschke v. State, 450 So.2d 177 (Ala.Cr.App.1984). A trial court's ruling that a statement was voluntary will not be reversed unless it is "manifestly contrary to the great weight of the evidence." Malone v. State, 452 So.2d 1386, 1389 (Ala. Cr.App.1984).
The facts relating to Barbour's confession are as follows: Lieutenant William Davis, chief investigator for the Montgomery Fire Department, testified that he talked with Barbour on May 1, 1992, after Barbour had become a suspect in a series of fires that had been set at Winn Dixie grocery stores. Davis asked Barbour to take a polygraph test concerning those fires. Barbour agreed to do so. Before the polygraph test was administered, Barbour became a suspect in the arson at Thelma Robert's house on Manley Drive. Before Barbour took the polygraph test, Davis notified him that the polygraph test would concern the fire set on Manley Drive and not the Winn Dixie fires. Barbour consented to take the polygraph test. The person who administered the test to Barbour told Davis that Barbour had not been truthful when answering one of the questions. Barbour was then taken to another fire station and was read his rights. He made a statement at that time. After giving his statement, Barbour said that he was hungry and he was given a meal. After Barbour ate, he gave a statement, which was taperecorded. Davis then notified Detective Danny Carmichael of the Montgomery Police Department and Barbour was transported to the Montgomery police station. Barbour was taken to a video room where he made a videotaped confession. Davis and Carmichael testified that during this whole exchange with Barbour no one coerced Barbour, used physical force against him, promised him anything, or threatened him in any way in order to get him to make a statement.
Assistant Chief John McKee of the Montgomery Fire Department testified that he administered the polygraph test to Barbour. Barbour signed a consent to take the polygraph test, which was received into evidence, and a Miranda[1] waiver form before taking the test. McKee testified that during the test Barbour was not questioned about the murder on Manley Drive but that he was questioned about the fire set on Manley Drive. McKee stated that after Barbour completed the polygraph test he told Barbour that he felt that Barbour had not been truthful in his response to one of the questions.
Barbour testified for the limited purpose of establishing the circumstances surrounding his confession. He testified that during the interview that resulted in his confession Detective Carmichael slapped him five times and that Lieutenant Davis threatened him. He further stated that he was told that he did not have to take the polygraph test but that he felt forced to do so.
Barbour's main argument at trial concerning the confession was that he was psychologically and physically coerced to confess.
"In Johnson v. State, (Fla.App.) 1964, 166 So.2d 798, the court stated:
"`Perhaps the most frequent instances of a jury being advised of a defendant's having taken a lie detector test are in cases involving confessions or admissions procured in anticipation of, during or subsequent to administration of a lie detector examination. It is well established that the mere fact that a lie detector examination may have been involved in procuring a confession does not render the confession inadmissible. (citing cases) However, if the defendant is forced to submit to the examination or if the methods of examination are such as to constitute actual or psychological coercion the resulting confession may well be found involuntary.'"
Grace v. State, 48 Ala.App. 507, 509, 266 So.2d 310, 312, cert. denied, 289 Ala. 744, 266 So.2d 316 (1972). (Emphasis added.)
We must look at the "totality of the circumstances" surrounding the confession to determine if it is voluntary. Boulden v. Holman, 394 U.S. 478, 89 S.Ct. 1138, 22 L.E.2d *467 433 (1969); Fikes v. Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957).
"The question of whether a confession was obtained by coercion or improper inducement can be determined only by examination of all the attendant circumstances. Boulden v. Holman, 394 U.S. 478, 89 S.Ct. 1138, 22 L.E.2d 433 (1969); Wallace [v. State, 290 Ala. 201, 275 So.2d 634 (1973) ]. Each case must stand or fall on its own merits for the constitutional inquiry into the issue of voluntariness requires more than a mere `color-matching of cases.' Beecher v. Alabama, 389 U.S. 35, 88 S.Ct. 189, 19 L.Ed.2d 35 (1967). The true test of determining whether extrajudicial confessions are involuntary is whether the defendant's will was overborne at the time he confessed and therefore not the product of a rational intellect and a free will. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); Elliott v. State, 338 So.2d 483 (Ala.Cr.App.1976)."
Eakes v. State, 387 So.2d 855, 859 (Ala.Cr. App.1978).
As the Alabama Supreme Court stated in Ex parte Hill, 557 So.2d 838, 841 (Ala.1989):
"This Court has long recognized that confessions or statements obtained by violence, or threats of violence, are per se involuntary and therefore inadmissible. Redd v. State, 69 Ala. 255 (1881). Other direct means of inducing confessions involving psychological, rather than physical, manipulation, such as offers of benefits, rewards, or immunity have also been held to be unconstitutional. See, e.g., Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959); Watts v. Indiana, 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801 (1949); Ashcraft v. Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1944). The use of those techniques has led courts to deem the resulting confessions to be coerced, and therefore in violation of the defendant's Fifth and Sixth Amendment rights. See, e.g., Spano, 360 U.S. at 323-24, 79 S.Ct. at 1207-08, 3 L.Ed.2d at 1271-72; Watts, 338 U.S. at 53-55, 69 S.Ct. at 1349-50, 93 L.Ed. at 1806-07; Ashcraft, 322 U.S. at 153-54, 64 S.Ct. at 926, 88 L.Ed. at 1199. However, more subtle forms of psychological manipulation, such as trickery or deception by the police, have not been considered sufficiently coercive, standing alone, to render a confession or incriminating statement involuntary. Instead, the trial judge must examine the totality of the circumstances surrounding the statement to determine its voluntariness. Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969)."
The trial court made a finding of fact that the statement was voluntary. That finding, when based on conflicting evidence, is to be given considerable deference by this court. "Where there is a genuine conflict of evidence great reliance must be placed upon the finder of fact." Blackburn v. Alabama, 361 U.S. 199, 208, 80 S.Ct. 274, 281, 4 L.Ed.2d 242 (1960).
Of importance in this case is the fact that Barbour's confession was videotaped and that the videotape of the confession was made a part of the record on appeal. This court thus has the rare opportunity of viewing an appellant's demeanor when he made his confession. After reviewing the videotaped confession, we conclude that there is no indication that Barbour was coerced in any way to make the statement to police or that he had been physically abused before making the statement. Barbour was extremely cooperative, calm, and articulate. He even drew diagrams of the interior of the victim's house. Further, he did not appear despondent at any time during the hour-long confession. The court did not err in allowing the videotaped confession to be received into evidence.

IV
Barbour further contends that the court erred in failing to instruct the jury on manslaughter as a lesser offense to capital murder.
A charge on a lesser offense should be given when there is "a reasonable theory from the evidence" to support such an instruction. Dobyne v. State, 672 So.2d 1319 (Ala.Cr.App.1994); Kennedy v. State, 472 So.2d 1092, 1102 (Ala.Cr.App.1984), aff'd, 472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985).
*468 There was absolutely no evidence that would bring the offense under the manslaughter statute. Barbour stated in his confession that he and his two friends had bought a 12-pack of beer and had drunk the beer before the killing occurred. However, there is no evidence in the record of how much he had to drink or whether he was intoxicated. Barbour did not state at any time that he was intoxicated. As this court stated in Hutcherson v. State, [Ms. CR-92-925, May 27, 1994] ___ So.2d ___, ___ (Ala.Cr.App.1994):
"`In the present case, the record contains no evidence either that defendant consumed an inordinate quantity of drugs or alcohol, or that his behavior actually demonstrated diminished capacity. Accordingly, the court committed no error in failing to instruct the jury on lesser included offenses based on defendant's failure to form a specific intent to commit the underlying felony.'"
Quoting People v. Kaurish, 52 Cal.3d 648, 802 P.2d 278, 303, 276 Cal.Rptr. 788 (1990), cert. denied, 502 U.S. 837, 112 S.Ct. 121, 116 L.Ed.2d 89 (1991). The evidence clearly points to the conclusion that Barbour was not so intoxicated at the time of the offense that his behavior demonstrated diminished capacity. Barbour gave a very detailed account of the events that occurred on the night of the murder. No error occurred here.

V
Barbour further contends that the court erred in considering a presentence report in sentencing the appellant because the report reflects that the person preparing the report did not adequately investigate Barbour's background. However, the court specifically stated in its sentencing order that it did not consider the presentence report.

VI
Barbour further asserts that the court erred in excluding from its consideration a letter from the victim's brother requesting that Barbour be sentenced to life in prison without parole instead of death. The court in its sentencing order thoroughly addressed its reasons for excluding the letter from consideration. The court stated:
"David L. Bishop, Mrs. Roberts's brother, has written the Court and, on behalf of Roberts's family, requested that Barbour be sentenced to life without parole. The State argues that the holding in Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), prohibits consideration of this request. The State is essentially correct.
"In Payne, the court held that if the State `chooses to permit the admission of victim impact evidence and prosecutorial argument on the subject, the Eighth Amendment erects no per se bar.' McMillian v. State, 594 So.2d 1253, 1275 (Ala.Cr. App.1991). Payne did not address the issue in this case, whether a request for leniency by the victim's family can properly be considered as a mitigating circumstance.
"The United States Supreme Court in Eddings v. Oklahoma, 455 U.S. 104 [102 S.Ct. 869, 71 L.Ed.2d 1] (1982), held that the sentencer in capital cases must be permitted to consider any relevant mitigating factor touching the defendant's character and record.
"The Court is aware of three cases which address the specific issue presented. In Floyd v. State, 497 So.2d 1211 (Fla. 1986), the court held the testimony of the murder victim's daughter that she and the victim opposed capital punishment was mitigating evidence. However, on retrial of the case, the trial judge refused to allow the victim's daughter to testify to her opinion as to whether Floyd should be executed and the Florida Supreme Court held that the trial judge did not abuse his discretion. Floyd v. State, 569 So.2d 1225 (1990), cert. denied, 501 U.S. 1259, 111 S.Ct. 2912 [115 L.Ed.2d 1075] (1991). The Tenth Circuit Court of Appeals held that a victim's relative was properly prohibited from expressing her opinion that the death penalty should not be imposed in Robison v. Maynard, 829 F.2d 1501 (10th Cir.1987) (applying Oklahoma law). See Robison v. Maynard, 943 F.2d 1216 (10th Cir.1991) (the court reached the same conclusion *469 upon consideration after Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) was decided). See Kathryn E. Bartolo, Payne v. Tennessee: The Future Role of Victim's Statements of Opinion in Capital Sentencing Proceedings, 77 [Iowa] L.Rev. 1217 (1992).
"The Alabama Supreme Court recently held that the defendant's `Eighth Amendment rights were violated if the trial judge... considered the portions of the victim impact statement wherein the victim's family members offered their characterizations or opinions of ... the appropriate punishment.' Ex parte McWilliams, 640 So.2d 1015 (Ala.1993).
"The Court held that opinions of family members as to the appropriate punishment either for the death penalty, Ex parte McWilliams, or against the death penalty, Robison I & II, are inadmissible. The reasoning of the Court in Robison I is persuasive. The Court reasoned that such opinion evidence is not relevant because mitigating evidence is composed of evidence of the defendant's character or record or any of the circumstances of the offense, and the witnesses' opinion of the appropriate punishment is not relevant to either. In Robison II the court further explained its holding in Robison I, and, notwithstanding that the jury is the sentencing authority in Oklahoma, the court's reasoning is also persuasive. The court said that the proffered testimony `was calculated to incite an arbitrary response [from the jury], thus it was properly excluded.' Robison, II at 1217."
The trial court's ruling was correct for the reasons stated by the Alabama Supreme Court in McWilliams v. State, 640 So.2d 1015, 1017 (Ala.1993). The court stated:
"In Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), the United States Supreme Court vacated a death sentence, holding that it violated the defendant's Eighth Amendment rights for the sentencer to consider victim impact statements in sentencing the defendant to death. The victim impact statements in that case contained the same types of information as were in the statements in the present case. In Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the Supreme Court partially overruled Booth. The Court in Payne held that the defendant's Eighth Amendment rights were not violated by the trial court's consideration of statements regarding the victims and the impact of their deaths upon the family members. The victim impact statements in Payne did not contain characterizations or opinions about the defendant, the crime, or the appropriate punishment. That portion of Booth that proscribed the trial court's consideration of that type of statement was, therefore, left intact by Payne.

"We conclude that McWilliams's Eighth Amendment rights were violated if the trial judge in this case considered the portions of the victim impact statements wherein the victim's family members offered their characterizations or opinions of the defendant, the crime, or the appropriate punishment."
(Emphasis added.)

VII
Barbour next contends that the trial court erred in denying his request during the penalty phase to poll the jury as to whether at any time during its deliberations a majority of the jurors favored life without parole.
The jury was polled after returning its recommendation in the penalty phase and indicated that it favored the death penalty for Barbour by a vote of 10 to 2. What Barbour sought to do was not to poll the jury, but rather to dissect its deliberations. Barbour has no such right.
"As a general rule, neither testimony nor affidavits are admissible to impeach a jury's verdict. An exception to this rule exists when an affidavit tends to show extraneous facts that have influenced the jury's deliberations and the resulting verdict. Affidavits, such as the one at issue here, concerning `the debates and discussions of the case by the jury while deliberating thereon' do not fall within the exception to the rule."
Alabama Power Co. v. Turner, 575 So.2d 551, 556-57 (Ala.), cert. denied, 500 U.S. 953, *470 111 S.Ct. 2260, 114 L.Ed.2d 713 (1991). (Citations omitted.) (Emphasis added.) See Adair v. State, 641 So.2d 309 (Ala.Cr.App. 1993).
Furthermore, this rule has been embodied in Federal Rule of Evidence 606(b) and in Proposed Alabama Rule of Evidence 606(b). Proposed Alabama Rule of Evidence 606(b) states:
"Upon inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent or to dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes."
The trial court did not err in denying Barbour's request.

VIII
Barbour next contends that plain error occurred when an elected judge sentenced him to death. In other words, he contends that an elected circuit judge is more likely to impose the death penalty in order to appear tough on crime to the voting public and, in turn, retain the office and salary of circuit judge.
"`[T]here is a presumption that a judge is qualified and unbiased, and ... one alleging to the contrary has a substantial burden of proof.' Henderson [v. G & G Corp., 582 So.2d [529] at 530 [ (Ala.1991) ]. Additionally, `[a]dverse rulings during the course of the proceedings are not by themselves sufficient to establish bias and prejudice' on the part of a judge. Hartman v. Board of Trustees of the Univ. of Alabama, 436 So.2d 837, 841 (Ala.1983); Matter of Sheffield, 465 So.2d 350, 357 (Ala. 1984)."
Boros v. Baxley, 621 So.2d 240, 243 (Ala.), cert. denied, ___ U.S. ___, 114 S.Ct. 563, 126 L.Ed.2d 463 (1993).
Barbour has not shown any bias on the part of the trial court. He was sentenced to death after being found guilty by a jury and after a jury recommended that he be sentenced to death. There was no plain error here.

IX
Barbour further contends that the court erred in finding that the murder was especially heinous, atrocious, or cruel as compared to other capital offenses.
The court's sentencing order states in pertinent part:
"The State argues that the Court must consider the entire chain of events in determining whether the 8th aggravating circumstance is proved, and must consider what occurred after Roberts was rendered unconscious. State v. Kingsley [252 Kan. 761], 851 P.2d 370, 392 (Kan.1993). The Court first notes that Kingsley is not a death penalty case, and secondly, the Kingsley court noted that death penalty cases are not appropriate precedent for hard 40 cases [those cases in which the defendant was sentenced to life without eligibility for parole until 40 years had been served]. This Court assumes the converse is true, hard 40 cases are not appropriate precedent for death penalty cases. However, the Court agrees with the State, but the status of the victim must be borne in mind while considering the surrounding events. See Conklin v. State, [254 Ga. 558, 331 S.E.2d 532 (Ga.1985) (events which transpire after the murder may be considered in determining whether the murder was outrageously or wantonly vile, horrible or inhuman), cert. denied 474 U.S. 1038 [106 S.Ct. 606, 88 L.Ed.2d 584] (1985) reh'g denied, 475 U.S. 1040, [106 S.Ct. 1252, 89 L.Ed.2d 359] (1986).
"The State suggests that the facts and holdings in Dunkins v. State, 437 So.2d 1349 (Ala.Crim.App.1983), aff'd, Ex parte Dunkins, 437 So.2d 1356 (Ala.1983); Brown v. State, 545 So.2d 106 (Ala.Crim. *471 App.1988), aff'd, Ex parte Brown, 545 So.2d 122 (Ala.1989); and Bankhead v. State, 585 So.2d 97 (Ala.Crim.App.1989), remanded on other grounds, Ex parte Bankhead, 585 So.2d 112 (Ala.1991), are ample authority to find that the instant capital offense was especially heinous, atrocious, or cruel.
"In Dunkins, the victim was stabbed 66 times over multiple body surfaces, raped, and tied to a tree with her nightgown or negligee wrapped on her head. There is no evidence that she was unconscious during any phase of the attack. In Brown, the victim was attacked by three men, beaten or choked unconscious and dragged into his trailer. Inside the trailer, he was stabbed a total of 78 times and beaten with an iron skillet. The victim was not killed by the majority of the stab wounds because he tried to get up, whereupon his throat was cut. Eighteen of the stab wounds were to the victim's neck and face. Bankhead was a co-defendant to Brown, and the facts in Bankhead are identical to Brown.

"The Court finds the facts in the abovecited case so much more egregious than the facts sub judice that they are not direct authority for the conclusion urged by the State.
"The Court does find that Roberts did suffer before she was killed, because she was savagely beaten by Barbour, Mitchell and Hester into a stupefied state or into a state of unconsciousness. In any event, she was rendered helpless. What Roberts's thoughts were during this attack, we will never know. However, common sense dictates that when attacked by three relative strangers, one must be fearful of their ultimate fate. Thus, Roberts suffered psychologically. In addition, the blows were surely painful.
"The Court finds that based on a consideration of all the circumstances from the moment the attack began until Barbour, Mitchell and Hester left Roberts's home, the State has proved beyond a reasonable doubt that the capital offense was heinous, atrocious, or cruel. This legal conclusion is based on an amalgam of the case law on this subject. This case has some of the characteristics of Dunkins and Brown, and some of the characteristics of Lawhorn v. State, 581 So.2d 1159 (Ala.Crim.App.1990), aff'd, Ex parte Lawhorn, 581 So.2d 1179 (Ala.1991).
"A summary of the facts is appropriate. Roberts was beaten into a helpless state. She was then raped by Hester as she lay helpless. Barbour concluded that she must die because she knew who her attackers were, and he stabbed her nine times with such force that two of the blows penetrated Roberts' back. Barbour left the murder weapon protruding from Roberts' chest. Barbour then set a fire or fires in an attempt to hide the criminal act. The fires resulted in some mutilation of Roberts's body."
(Emphasis added.)
The court's finding that the murder was especially heinous, atrocious, or cruel as compared to other capital cases is supported by the record. As the court stated in its findings of fact, the victim moaned after she was stabbed. There was evidence that the victim suffered before her death. To be considered especially heinous, atrocious, or cruel, the murder must be "unnecessarily torturous" to the victim. Ex parte Kyzer, 399 So.2d 330 (Ala.1981). That finding is supported by the record here. (See the emphasized portion of the above-quoted sentencing order.)
Barbour further contends that the court's order did not comply with the law because, he says, it did not contain a discussion of the weighing process the court used to determine whether the aggravating circumstances outweighed the mitigating ones. According to  13A-5-47, the trial court is required to make written findings. This section states in part:
"(d) Based upon the evidence presented at trial, the evidence presented during the sentence hearing, and the pre-sentence investigation report and any evidence submitted in connection with it, the trial court shall enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, each mitigating circumstance enumerated in Section 13A-5-51, *472 and any additional mitigating circumstances offered pursuant to Section 13A-5-52. The trial court shall also enter written findings of facts summarizing the crime and the defendant's participation in it.
"(e) In deciding upon the sentence, the trial court shall determine whether the aggravating circumstances it finds to exist outweigh the mitigating circumstances it finds to exist, and in doing so the trial court shall consider the recommendation of the jury contained in its advisory verdict...."
The court's sentencing order fully complies with  13A-5-47. The 17-page order thoroughly addressed the aggravating and the mitigating circumstances applicable to the case. The court stated in its conclusion that in sentencing the appellant it had weighed the aggravating circumstances against the mitigating ones and found that the aggravating circumstances outweighed the mitigating ones. No error occurred here.

X
As required by  13A-5-53, Code of Alabama 1975, this court will address the propriety of Barbour's conviction and sentence to death by electrocution. Barbour was indicted for capital murder as defined in  13A-5-40(a)(2), (a)(3), (a)(4), (a)(9), i.e., murder committed during the course of a robbery, rape, burglary, and arson. Barbour was convicted of capital murder committed during the course of a rape, a burglary, and arson.
The record reflects that Barbour's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor.  13A-5-53(b)(1), Code of Alabama 1975.
A review of the record shows that the trial court correctly found that the aggravating circumstances outweighed the mitigating circumstances. The trial court reviewed all the evidence offered in mitigation and found as statutory mitigating circumstances that Barbour had no long history of felony convictions and that he was 21 years of age at the time of the murder.  13A-5-51(1) and 13A-5-51(7). The court also found several nonstatutory mitigating circumstances which dealt with Barbour's background, his upbringing, and the fact that he had shown remorse for the murder. The court also found as a nonstatutory mitigating circumstance the fact that the appellant cooperated with police. The court found as aggravating circumstances that the offense was committed during the course of a rape and a burglary, and that the murder was especially heinous, atrocious, or cruel as compared to other capital offenses.  13A-5-49(2), -49(4), and -49(8), Code of Alabama 1975. The court weighed the mitigating circumstances and the aggravating circumstances and sentenced Barbour to death. We agree with the court's findings in the present case.
However, pursuant to  13A-5-53(b)(2), this court must independently weigh the aggravating and the mitigating circumstances to determine the propriety of Barbour's death sentence. After an independent weighing, this court is convinced that Barbour's sentence to death by electrocution is the appropriate sentence.
As  13A-5-53(b)(3) provides, we must also address whether Barbour's sentence was disproportionate or excessive when compared to the penalties imposed in similar cases. Barbour's sentence was neither. Hunt v. State, 659 So.2d 933 (Ala.Cr.App.1994); Freeman v. State, 555 So.2d 196 (Ala.Cr.App. 1988), aff'd 555 So.2d 215 (Ala.1989), cert. denied, 496 U.S. 912, 110 S.Ct. 2604, 110 L.Ed.2d 284 (1990).
Last, we have searched the entire record for any error that may have adversely affected the appellant's substantial rights and have found none. Rule 45A, Ala.R.App.P.
The appellant's conviction and sentence to death are due to be, and are hereby, affirmed.
AFFIRMED.
All the Judges concur.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).